NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| KAREN K. CAPATO | : | |
| o/b/o  B.N.C. | : | |
|        K.N.C. | : | |
| | : | |
|           Plaintiff, | : | **Hon. Dennis M. Cavanaugh** |
| | : | |
|           v. | : | **OPINION** |
| | : | |
| MICHAEL J. ASTRUE, | : | Civil Action No.: 08-5405 (DMC) |
| Commissioner of Social Security, | : | |
| | : | |
|           Defendant. | : | |
| | : | |

<u>DENNIS M. CAVANAUGH, U.S.D.J.</u>

This matter comes before the Court upon Karen Capato's ("Plaintiff") appeal from the Commissioner of Social Security's ("Commissioner") final decision denying Plaintiff's request for child's insurance benefits on the account of deceased wage earner Robert Nicholas Capato (the "decedent") under the Social Security Act (the "Act"). No oral argument was heard pursuant to Rule 78 of the Federal Rules of Civil Procedure.  For the reasons set forth below, the final decision of the Commissioner is affirmed.

**I.**     <u>BACKGROUND</u>[1]

A.     Procedural Background

On October 31, 2003, Plaintiff applied for child's insurance benefits on behalf of the minor children on the account of deceased number holder Robert Nicholas Capato. (Transcript "Tr."

---

[1] The facts set-forth in this Opinion are taken from the Parties' statements in their respective briefs.

31-33). Plaintiff's application was denied. Plaintiff filed a request for reconsideration, and, again, these claims were denied. (Tr. 194-95, 206-12). On May 11, 2006, Plaintiff requested a hearing by an Administrative Law Judge ("ALJ"). (Tr. 213). On May 30, 2007, Plaintiff appeared with counsel before ALJ Joel Friedman. (Tr. 257-315). ALJ Friedman considered the evidence and testimony de novo and, on November 28, 2007, issued a decision denying the claims. (Tr. 11-21). On September 10, 2008, the Appeals Council denied Plaintiff's request for review. (Tr. 6-8). This action followed.

   B.  Factual Background

    1.  Testimonial Evidence

  Decedent wage earner was born in Kent, Washington on May 1, 1957. (Tr. 235).  Plaintiff testified that she and the decedent met in the mid-1990s in Seattle, Washington. (Tr. 281-82). They lived together in Florida, first in Tampa and later in Pompano Beach, and were married in New Jersey. (Tr. 282). The decedent started a chain of health clubs in Florida. (Tr. 286). Plaintiff further testified that their final destination was going to be New Jersey. (Tr. 287). In August 1999, the decedent was diagnosed with esophageal cancer. Id. Plaintiff testified that, immediately after the decedent's diagnosis, they decided to freeze his sperm because the chemotherapy used to treat the decedent's cancer could lead to infertility. (Tr. 283-84). Plaintiff testified that, in August 2001, she and the decedent had their first child together; this child, D.C., was conceived through natural means. (Tr. 284). Plaintiff further testified that, shortly before the birth of D.C., she and the decedent decided to move to New Jersey to try to open businesses there.  (Tr. 285). It was at this time that Plaintiff and the decedent had conversations about where they would live in New Jersey (Tr. 285-86). Plaintiff testified that the decedent executed his last will and testament

and that the decedent talked with an attorney about including unborn children in the will. (Tr. 288). Plaintiff testified that the decedent attempted to incorporate a business in New Jersey to start opening health clubs there so that, ultimately, the family could move there. (Tr. 291).

Testifying on Plaintiff's behalf was Michelle Ann Cappola ("Ms. Cappola"). (Tr. 267-72). Ms. Cappola testified that she had known Plaintiff for 30 years, first becoming friends in high school. (Tr. 267). She testified that she had met the decedent, who had indicated to her in an undated conversation that he wanted a sibling for his child D.C. (Tr. 268). Ms. Cappola also testified that she was employed part-time as a realtor and had conversed with the decedent about business locations in the State of New Jersey. (Tr. 269). She stated that, as far as she knew, the decedent also wanted to move his residence to New Jersey. Id. Also testifying on Plaintiff's behalf was Jan Cooper ("Ms. Cooper"). (Tr. 272-78). Ms. Cooper testified that she had known Plaintiff for 15 years through work. (Tr. 273). Ms. Cooper testified that, when Plaintiff and the decedent were living in Florida, they had talked with her after the birth of their child D.C. about moving to New Jersey. (Tr. 275). She testified that, at Thanksgiving in 2001, the decedent told her that he had been preserving sperm so that D.C. would not be an only child (Tr. 276)

2.      Documentary Evidence

Plaintiff and the decedent were married in Weehawken, New Jersey, on May 15, 1999. (Tr. 236). The decedent was diagnosed in 1999 with esophageal carcinoma. (see Tr. 245). In April 2000, Plaintiff and the decedent began a program of preserving sperm for in vitro fertilization at the Northwest Center for Infertility and Reproductive Endocrinology in Florida. (Tr. 76-95). On December 7, 2000, Dr. Howard Adler ("Dr. Adler") of the Center for Hematology-Oncology evaluated the decedent's cancer (Tr. 245-47). Dr. Adler noted that

Plaintiff was diagnosed with esophageal carcinoma and was receiving radiation treatment and chemotherapy (Tr. 245). Dr. Adler continued the decedent on these treatments, with medicine to help his appetite (Tr. 246-47). On April 11, 2001, Dr. Adler opined that the decedent was doing quite well and indicated that the decedent was receiving aggressive treatment (Tr. 244). However, by November 2001, Dr. Adler noted that, after a period of doing quite well, the decedent had a recurrence of the disease and his prognosis was poor (Tr. 242).

On December 12, 2001, the decedent executed his last will and testament under Florida law. (Tr. 161-89). This will disposes of the decedent's tangible personal property to Plaintiff, if she survives him, and then to any of his children who survive him. (Tr. 161). The residuary estate was distributed to two children from a previous marriage and to Plaintiff, with a provision for the decedent's child D.C., if Plaintiff did not survive him. (Tr. 162). If neither Plaintiff nor D.C. survived him, then decedent's residuary estate was to be distributed in accordance with the intestacy laws of Florida, with the decedent's heirs to be determined at the time of his death. Id. The will provides for administration of a marital trust, a family trust, and a trust for D.C. (Tr. 163-65).

On March 23, 2002, the decedent died of metastatic esophageal cancer. (Tr. 235). At the time of his death, the decedent resided in Pompano Beach, Florida. Id. Shortly thereafter, Plaintiff underwent artificial insemination treatments in Florida. (Tr. 96-102). Plaintiff later received artificial insemination treatments at Reproductive Medicine Associates of New Jersey ("RMA") starting in November 2002. (Tr. 103-34). On September 23, 2003, Plaintiff gave birth to twins, the minor children. (Tr. 237-38). Dr. Richard Scott ("Dr. Scott") of RMA wrote a letter dated December 1, 2003, indicating that the minor children were conceived in January 2003 from

4

the decedent's sperm. (Tr. 136).

## II.   STANDARD OF REVIEW

The Court's review is limited to determining whether the Commissioner's decision is based upon the correct legal standards and is supported by substantial evidence in the record as a whole. See 42 U.S.C. § 405 (g); see also Richardson v. Perales, 402 U.S. 389, 390 (1971). A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom., Williams v. Shalala, 507 U.S. 924 (1993). Substantial evidence is defined as that quantum of evidence which a "reasonable mind might accept as adequate to support a conclusion." Perales, 204 U.S. at 401 (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld. 42 U.S.C. § 405 (g). "Substantial evidence" means more than "a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

> Some types of evidence will not be "substantial." For example, [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g. that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)). The ALJ must make specific findings of fact to support the ALJ's ultimate conclusions. Stewart v. Sec'y of HEW, 714 F.2d 287, 290 (3d Cir.

1983). "Where the ALJ's findings of fact are supported by substantial evidence, the [reviewing court] is bound by these findings, even if [it] would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 35 (3d Cir. 2001). Thus, substantial evidence may be slightly less than a preponderance. Stunkard v. Sec'y of Health & Human Servs., 841 F.2d 57, 59 (3d Cir. 1988).

"The reviewing court, however, does have a duty to review the evidence in its totality." Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984)). In order to review the evidence, "a court must 'take into account whatever in the record fairly detracts from its weight.'" Id. (quoting Willibanks v. Sec'y of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988)). The Commissioner has a corresponding duty to facilitate the court's review: "[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)). As the Third Circuit has held, access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of HEW, 567 F.2d 258, 259 (4th Cir. 1977)).

"[The reviewing court] need[s] from the ALJ not only an expression of the evidence []he considered which supports the result, but also some indication of the evidence which was

rejected." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). Without such an indication by the

ALJ, the reviewing court cannot conduct an accurate review of the matter; the court cannot

determine whether the evidence was discredited or simply ignored. See Burnett v. Comm'r of

Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citing Cotter, 642 F. 2d at 705); Walton v. Halter,

243 F.3d 703, 710 (3d Cir. 2001). "The district court ... is [not] empowered to weigh the

evidence or substitute its conclusions for those of the fact-finder."  Williams, 970 F.2d at 1182

(citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

## III.    DISCUSSION

Before this Court is Plaintiff's appeal of the ALJ's decision finding that Plaintiff's minor

children do not qualify as children of the decedent under the Social Security Act and thus are not

entitled to child's insurance benefits. Plaintiff argues that the Commissioner's decision was not

supported by substantial evidence; that the ALJ was biased and failed to heed the documentation

presented and the testimony of the witnesses; that Plaintiff and decedent's minor children, the

Capato twins' rights to equal protection under the Fifth Amendment have been violated; that the

denial of benefits for the twins violates the Act's statutory scheme; and that the Commissioner's

decision to issue an acquiescence ruling limiting application of Gillet-Netting v. Barnhart, 371

F.3d 593 (9th Cir. 2004) to the Ninth Circuit arbitrarily denies benefits to children outside of the

Ninth Circuit. Finding that the ALJ properly evaluated the applicable law, and because the ALJ's

and Commissioner's decisions were supported by substantial evidence, this Court  affirms the

decision of the ALJ.

A.    The Commissioner's Decision was Supported by Substantial Evidence

Substantial evidence supports a finding that the twins do not qualify as children of the

7

decedent under the Act. There are two ways for minor children to qualify for dependent's benefits under the Act. The minor children of the decedent may establish their rights to inherit as the decedent's children under state intestacy laws pursuant to 42 U.S.C. Section 416(h)(2)(A) or through the alternative mechanisms under 42 U.S.C. Section 416(h)(2)(B), Section 416 (h)(2)(C)(i) or Section 416 (h)(2)(C)(ii).

     1.     The Twins Are Not "Children" Under the Social Security Act's Criteria

The Act includes both a definition of "child" and instructions on how the Commissioner should determine whether an applicant is a "child." Under 42 U.S.C. Section 416(e), "child" can mean "(1) the child or legally adopted child of an individual, (2) a stepchild...and (3) a person who is the grandchild or stepgrandchild...." However, Congress's instructions for the primary method utilized by the Commissioner in determining parent-child relationships is provided under Section 416(h)(2)(a) of the Act, captioned "Determination of Family Status," which states:

> In determining whether an applicant is the child...of a fully or currently insured individual for purposes of this title, the Commissioner of Social Security shall apply such law as would be applied in determining the devolution of intestate personal property...by the Courts of the State in which [such insured individual] was domiciled at the time of his death...Applicants who according to such law would have the same status relative to taking intestate personal property as a child or parent shall be deemed such.

If an applicant does not qualify as a "child" under this provision, Congress provided three alternative mechanisms for establishing child status; however, each requires that the insured be living at the time of the child's conception. See 42 U.S.C. S 416(h)(2)(B) (applicant is deemed to be the "child" of the insured if the insured and other parent went through a marriage ceremony that would have been valid but for certain legal impediments); 42 U.S.C. S 416(h)(3)(C)(i) (applicant is deemed to be the "child" of the insured if the insured had acknowledged paternity in

8

writing, or if a court decreed the insured to be the parent or ordered the insured to pay child

support, and such acknowledgment, court decree, or court order was made "*before the death of

the insured*" (emphasis added); and 42 U.S.C. S 416(h)(3)(C)(ii) (applicant is deemed the "child"

if there is satisfactory evidence that the insured was the applicant's parent and the insured was

living with or supporting the applicant at the time of death).

     Substantial evidence supports the ALJ's finding that the insured was domiciled in the

State of Florida at the time of death. The Capato twins are neither heirs under Florida's intestacy

law nor beneficiaries of the decedent's will. Therefore, under Section 416(h)(2)(a), the twins are

not entitled to Social Security benefits.

i.     The Decedent was Domiciled in Florida

     There is substantial evidence to support the ALJ's decision, in determining which state's

intestacy laws to apply, that the decedent was domiciled in Florida at the time of his death.

"[D]omicile is established by physical presence in a place in connection with a certain state of

mind concerning one's intent to remain there." Miss. Band of Choctaw Indians v. Holyfield, 490

U.S. 30, 48 (1989) (citing Texas v. Florida, 306 U.S. 398, 424 (1939)).

     Under District of Columbia v. Murphy, 314 U.S. 441, 455 (1941) residence alone is

sufficient to raise a presumption of domicile. "The place where a man lives is properly taken to

be his domicile until facts adduced establish the contrary." The decedent's residence was in

Florida at the time of his death. (Tr. 235). Further, the decedent executed his last will and

testament in the State of Florida, with all matters involving the validity and interpretation of the

will governed by the laws of Florida. (Tr. 160-189). The residuary clause of the will stated that

any residuary estate not distributed to those named in the will was to be distributed to the

9

decedent's heirs at law determined at the time as if he had died unmarried and intestate under Florida law then in effect. (Tr. 162). Plaintiff testified that she and the decedent had plans to move to New Jersey, and that they looked at real estate in New Jersey, but these plans were vague and indefinite, therefore, the ALJ's finding that the decedent was not domiciled in New Jersey was supported by substantial evidence. "It is not important if there is within contemplation a vague possibility of eventually going elsewhere, or even of returning whence one came." Gallagher v. Philadelphia Transp. Co., 185 F.2d 543, 545 (3d Cir. 1950); see also Barrett v. Greater Hatboro Chamber of Commerce, Inc., 2005 U.S. Dist. LEXIS 18673, *10 (E.D. Pa. Aug. 19, 2005); Murphy v. Miller, 2005 U.S. Dist. LEXIS 1823, *3 (E.D. Pa. Feb. 8, 2005). At the time of his death in 2002, the decedent had lived in Florida for roughly three years, a period sufficient to acquire domicile in Florida. The Third Circuit Court of Appeals has stated that "[a]n individual can change domicile instantly." McCann v. George W. Newman Irrevocable Trust, 458 F.3d 281, 286 (3d Cir. 2006).

Plaintiff provided additional documentary evidence to this Court, not provided to the ALJ, in an attempt to persuade this Court that Florida was not the domicile of the decedent. This new evidence consists of papers of incorporation for NICAP Industries, Inc. ("NICAP") (Ex. 1), federal tax returns from the decedent and his corporation (Ex. 2), and a photocopy of the decedent's passport (Ex. 3). However, the Social Security Act only provides for review of the Commissioner's decision and the evidence upon which the findings and decision are based, unless the new evidence is material and good cause is shown for why the evidence was not incorporated into the original record. 42 U.S.C. S 405(g); Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984) (requiring a showing of good cause for not

incorporating new evidence into the administrative record). Here, this new evidence was generated between 1998 and 2003 and was in Plaintiff's possession. Plaintiff has failed to show good cause as to why it was not presented to the ALJ or Appeals Council. Regardless, this evidence is not material and does not merit reversal of the ALJ's findings. The tax returns demonstrate that the decedent's corporation was incorporated in Washington, but are not evidence of fixed, definite plans to leave Florida. (Ex. 1). While the decedent listed a Washington address as the registered agent, Washington law requires such an address within the state for service of process. See Rev. Code Wash. Ann. S 23B.05.010. Tellingly, correspondence between the Internal Revenue Service and Plaintiff in her capacity as a corporate officer, dated July and August 2000, shows that NICAP's address is in Florida. (Ex. 2). NICAP's W-2 statements show that wages were paid to the decedent and Plaintiff who gave their address in Florida. (Ex. 2). The passport indicates that the decedent was born in Washington and that the passport was issued in Seattle in 1998, but does not indicate the decedent's home address. (Ex. 3). Therefore, this evidence is not sufficient to overturn the ALJ's finding that the decedent was both a resident and domiciliary of Florida.

        ii.      The Twins Do Not Qualify as "Children" of the Decedent Under Florida's Inheritance Laws

Under Florida's inheritance law, the possible heirs to an intestate estate include descendants, who are defined as persons "in any generational level down the applicable individual's descending line" and include, inter alia, children. Fla. Stat. Ann. S 731.201(9); see Fla. Stat. Ann. S 732.103(1). The laws of intestate succession specifically refer to "afterborn heirs," who are defined as "heirs of the decedent *conceived before his or her death*, but born

11

thereafter." Fla. Stat. Ann. S 732.106 (emphasis added). The Supreme Court in <u>Leatherman v. Tarrant Co. Narcotics Intelligence and Coordination Unit</u>, 507 U.S. 163, 167 (1993) stated that when a statute explicitly mentions one type of individual, it implicitly excludes unmentioned others.

> Florida law also provides:

> A child conceived from the eggs or sperm of a person or persons who died before the  transfer of their eggs, sperms, or preembryos to a woman's body shall not be eligible for a claim against the decedent's estate unless the child has been provided for by the decedent's will.

Fla. Stat. Ann. S 742.17(4). This is further evidence that under Florida law a child posthumously conceived does not have the legally recognized relationship to the biological parent that a child conceived in the parent's lifetime would have.

In <u>Stephen ex rel. Stephen v. Barnhart</u>, 386 F. Supp. 2d 1257, 1264-1265 (M.D. Fla. 2005) the District Court for the Middle District of Florida denied a claim for child's insurance benefits filed on behalf of the posthumously conceived child. In <u>Stephen</u>, the decedent died before the conception of the minor child. The minor child's mother applied for child's insurance benefits under the Act. <u>Id.</u> at 1259. The court held that, under Florida's intestacy laws, the minor child could not inherit from the wage earner's estate. <u>Id.</u> at 1260. Therefore, the minor child was not the "child" of the wage earner under 42 U.S.C. S 416(h)(2)(A). The decedent was domiciled in Florida, so the same law applies here.

The minor children do not meet the definition of "child" under 42 U.S.C. Sections 416 (e) and 416(h), so there is no need to address dependancy, the Act's second requirement of eligibility for benefits under 42 U.S.C. 402(d).

B.       The ALJ was Not Biased

In Plaintiff's brief, Plaintiff points to facts from a Memorandum submitted to the ALJ

that Plaintiff alleges are erroneous. Plaintiff argues that since the ALJ founnd these "errors" to be

fact, it shows a "predisposition to ignore testimony." Plaintiff's Brief ("Pl. Br.") at 5. Plaintiff

also asserts that the ALJ relied on a legal memorandum that was not served on Plaintiff. These

are the most cogent allegations of bias by the Plaintiff. Plaintiff also restated arguments about

domicile. However, even if Plaintiff's allegation that the ALJ adopted errors as fact is taken as

true, Plaintiff admitted that "These errors are not in themselves critical..." Id. As for the legal

memorandum, Plaintiff's attorneys responded affirmatively when asked if they had a chance to

review the exhibits (Tr. 261) and stated that there was no objection when the ALJ asked if

Plaintiff had any objection to accepting the documents into evidence (Tr. 262). This Court finds

substantial evidence to support the ALJ's determinations, and finds allegations of bias to be

unsupported by the record.

C.       The Commissioner's Denial of Benefits Did Not Violate the Equal Protection
         Clause

Plaintiff's argument that it would be a violation of Equal Protection to apply the Ninth

Circuit's holding in Gillett-Netting v. Barnhart, 371 F.3d 593 (9th Cir. 2004), entitling children

conceived through in-vitro fertilization following their father's death to receive Social Security

benefits, only within the jurisdiction of the Ninth Circuit, is unsupported.

The Act treats all children the same, whether or not posthumously conceived, through

the neutral incorporation of state intestacy laws. See, e.g., Vernoff v. Astrue, 568 F.3d 1102, 1112

("SSA is not excluding all posthumously conceived children, only those that do not meet the

13

statutory requirements under state law."). The Supreme Court in <u>Vacco v. Quill</u>, 521 U.S. 793, 800 (1997) pronounced the principle that laws that apply to all evenhandedly "unquestionably comply" with the mandates of the Equal Protection Clause.

Congress, in mandating that the Commissioner look to state intestacy law in order to determine eligibility for Social Security benefits, recognized that states have great interest in regulating family issues. Under guidance of the Supreme Court, federal courts generally defer to state laws in this regard. In <u>United States v. Morrison</u>, 529 U.S. 598, 615 (2000) the Supreme Court identified "family law" as an area of "traditional state regulation."

> D.   The Commissioner was Reasonable to Limit the Acquiescence Ruling to the Ninth Circuit

The Commissioner was required to issue an acquiescence ruling under 20 C.F.R. Section 404.985 because the Ninth Circuit's holding in <u>Gillett-Netting</u> conflicts with the Commissioner's interpretation of the Act and no further judicial review was sought.

The Commissioner explained the logic of exempting only the parties in an applicable circuit from being bound by its interpretation of a rule in its response to a comment on the 1998 revisions to 20 C.F.R. Section 404.985:

> As discussed in the preamble to the 1990 acquiescence regulations, 55 FR at 1012-1013 a number of studies on the subject of Federal acquiescence have noted that nationwide adoption of the decision of the first circuit court to address an issue (intercircuit acquiescence) would preclude other circuit courts from considering the issue. In 1984...the Solicitor General of the United States expressed similar concerns, stating that the practical effect of that legislation would be to require the Department of Justice to consider seeking Supreme Court review of the first adverse decision on an issue by any court of appeals. The Department of Justice reiterated these concerns in 1997.... An approach that would require nationwide adoption of the first circuit court decision on a  particular issue would not improve SSA's adjudicatory and policy making processes, but would instead result in the first circuit court that happened to rule on an issue setting SSA's national rules on that

> subject. In effect, the circuit court that would rule first would rule last. This result could hardly be intended by any reasonable interpretation of acquiescence and would undermine the advantages, which would have been recognized by the Supreme Court, of having issues considered by more than one circuit.

63 Fed. Reg. 24927 (May 6, 1998). Instead of allowing more than one circuit to consider an issue, Plaintiff's argument would give Supreme Court precedence to the first circuit court to decide that particular issue.

**IV.    CONCLUSION**

For the aforementioned reasons, the Court concludes that the ALJ's decision is **affirmed**. An appropriate Order accompanies this Opinion.

                                       S/ Dennis M. Cavanaugh
                                     Dennis M. Cavanaugh, U.S.D.J.

Dated:        March   23  ,  2010
Original:     Clerk
cc:          All Counsel of Record
               File